Filed 7/20/15  P. v. Terry CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CHARLIE TERRY, JR.,<br><br>    Defendant and Appellant. | F068006<br><br>(Kings Super. Ct. No. 13CM0701)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kings County.  Donna Tarter, Judge.

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

[*] Before Gomes, Acting P.J., Poochigian, J. and Peña, J.

After a bench trial, the court convicted appellant, Charlie Terry, Jr., of inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)) and being under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)).

On appeal, Terry contends: 1) the court admitted the victim's statement to police in violation of *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*); 2) the court admitted his statements to police in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); and 3) the evidence is insufficient to sustain his conviction for being under the influence of methamphetamine. We affirm.

## FACTS

On February 22, 2013, in the early morning hours, Joel Kim heard a woman screaming from a house down the street.

At approximately 1:21 a.m., Lemoore Police Officer Ryan O'Barr responded to the residence, which had its exterior and interior lights on and the front door open. As he parked across the street, Officer O'Barr heard a woman yelling. The officer was walking to the residence when a man, later identified as Terry, came to the front door and made eye contact with him. Terry immediately turned around, shut the door, and turned off the outside lights. O'Barr then saw silhouettes moving in the residence. Terry's wife, Jennette,[1] then came out of the house unclothed and crying hysterically. O'Barr contacted Jennette and she told him that Terry had gone into the kitchen. O'Barr ordered Terry to go outside where he pat searched him for weapons and had him sit down.

Officer O'Barr had Jennette go inside the house to get dressed. When she returned he started a tape recorder and began asking her questions to try to ascertain whether or not there was an ongoing emergency and whether she needed any medical attention. In the portion of the recording admitted into evidence, O'Barr asked Jennette several

---

[1] Mrs. Terry's first name has various spellings throughout the record. We adopt "Jennette" as the spelling for her first name because that is how she spelled her name in a letter she wrote and presented to the court at sentencing.

preliminary background questions including her name, address, and birthdate.[2]  He then asked her, "What's goin[g] on tonight."  In response to this question and several others, Jennette stated that Terry was a methamphetamine user who had been off the drug for three weeks.  However, he was high that day, even though he denied it, and he kept going in and out of the house.  Jennette then explained that she had been trying to get Terry to lie down and go to sleep on the living room floor because they had a driver's test the following morning.  As she and Terry lay on the floor in the living room, Terry began telling her he had seen a picture of her on the Internet and that she cheated on him.  Terry then told Jennette she was going outside with him and he wrapped something on her neck.  Terry began pulling her by the hair and dragging her unclothed outside, but she kept going back in the house.  At one point, Terry pushed Jennette down and began hitting her on the head.  O'Barr asked Jennette whether she needed an ambulance.  When she replied that she did not, O'Barr asked her more background questions.  He then stated:  "Ok I'm going to take this … step by step, ok so that I can fully understand what's going on, ok.  So you were, when did the whole Facebook thing come up?"

After the above portion of Jennette's interview was admitted into evidence, Officer O'Barr testified he saw three abrasions on Jennette's left knee, two of which were still slightly bleeding, an injury to her hip, and a cut on her lower left lip that appeared to have been caused by her lip striking her tooth.  The injuries to her knee and her hip were consistent with Jennette having been dragged on the ground.  The cut on her lip was

---

[2] Jennette asserted her Fifth Amendment right against self-incrimination and did not testify at the trial regarding her statements to Officer O'Barr because she was concerned that she might subject herself to prosecution for filing a false police report. During the trial, defense counsel objected only on hearsay grounds to her statements to O'Barr that the prosecutor sought to introduce into evidence.  The court overruled defense counsel's hearsay objection.  However, on its own initiative, the court also considered whether Jennette's statements to O'Barr were testimonial and, thus, barred by *Crawford*, *supra*, 541 U.S. 36.  The court ruled that the statements by Jennette that are summarized above were not testimonial and, thus, not barred by *Crawford*.

consistent with her having been struck on the face. O'Barr also observed that Terry had several scratches and other abrasions on both his hands.

Officer O'Barr also interviewed Terry. Terry told the officer that Jennette suffered from bipolar disorder and she would "flip out" and blame things on him. That night, he had gotten up to smoke a cigarette when Jennette began to strike him. At one point, she went into the backyard, threw herself down on a concrete area, and told Terry he was going to jail. They both went back inside the house and Jennette struck him a few more times. Terry started to go out the front door when he saw O'Barr arrive. Terry claimed his hands were cut when he put them up to prevent Jennette from scratching his face.

Officer O'Barr had Terry perform several tests to determine if he was under the influence of a controlled substance. The tests disclosed that Terry's pulse was 106 beats per minute, his eyelids fluttered, and when exposed to the light of a flashlight, Terry's pupils constricted from five millimeters to 4.5 millimeters and pulsated. These results led O'Barr to believe Terry was under the influence of a controlled substance, and he placed him under arrest.

At the police station, Officer O'Barr performed a presumptive test on a urine specimen provided by Terry and the specimen tested positive for amphetamine and methamphetamine. The specimen was also sent to a lab and analyzed by Bill Posey, a toxicologist. According to Posey, there was no threshold level of methamphetamine that he used to determine whether a person was under the influence. Further, a positive result meant only that the person had used methamphetamine in the previous three to four days before the sample was taken.

## DISCUSSION

### The Crawford Issue

Terry contends the court prejudicially erred when it allowed the prosecutor to introduce Jennette's statements because they were testimonial and, thus, their admission

4.

into evidence violated his Sixth Amendment right to confrontation pursuant to *Crawford*, *supra*, 541 U.S. 36. Respondent contends Terry forfeited this issue by his failure to object in the trial court on *Crawford* grounds to the introduction of Jennette's statement. Alternatively, respondent contends that the introduction of this statement did not violate *Crawford* because it was not testimonial. We reject the respondent's forfeiture argument but agree that the introduction of Jennette's statement did not violate *Crawford*.

> "The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.' In [*Crawford*, *supra*,] 541 U.S. [at pp. 53–54, the United States Supreme Court] held that this provision bars 'admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination.' " (*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*).)

> "[In *Davis*,] [t]he court succinctly distinguished testimonial from nontestimonial statements as necessary to decide the matters before it. 'Statements are nontestimonial,' the court said, 'when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.' [Citation.]" (*People v. Cage* (2007) 40 Cal.4th 965, 982 (*Cage*), fn. omitted, citing *Davis*, *supra,* 547 U.S. at pp. 819–824.)

In *Cage*, *supra*, 40 Cal.4th 965, the California Supreme Court stated,

> "We derive several basic principles from *Davis*. First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony. Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be

5.

determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, *statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial*." (*Id.* at p. 984, some italics added, fns. omitted.)

As a preliminary matter, respondent claims Terry forfeited his right to challenge Jennette's statements to Officer O'Barr under *Crawford* because he did not expressly invoke that decision as a ground for excluding them in the trial court. However, an objection was not required because the court, on its own initiative, interjected the *Crawford* issue in ruling on Terry's hearsay objection to these statements. The purpose of a timely, specific objection is to "to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility. [Citations.]" (*People v. Williams* (1988) 44 Cal.3d 883, 906.) Those goals were met here when the court addressed the *Crawford* issue on its own initiative. (*People v. Brenn* (2007) 152 Cal.App.4th 166, 173–174.)

Further, this case is similar to *People v. Johnson* (2007) 150 Cal.App.4th 1467 (*Johnson*). In *Johnson*, Officer Sevillo responded to a report of a domestic disturbance, knocked on the door of the residence, and heard a woman scream. The defendant answered the door with blood on his hands and shirt. The woman continued to scream. The officer entered the house and, in a bathroom, found the woman sitting on a toilet, slumped over covering her bloodied face with bloodied hands. The officer also observed that the woman's nose was swollen and red, and the bridge of her nose was purplish. The woman was emotional, distraught, and crying as Sevillo spoke to her to see if she was okay and to make sure she received medical attention. The officer asked her what happened and she said, " 'He punched me in the face, look at my nose.' " (*Id.* at pp. 1472–1473.)

6.

In holding that the woman's statements were not testimonial, and thus admissible, the *Johnson* court stated,

> "We decide the issue by applying the test set forth by the court [in *Davis*, *supra*, 547 U.S. 813]: Did the circumstances *objectively* indicate that there was an ongoing emergency when the victim made the statement to Sevillo? We think they do. Sevillo heard the woman screaming as he stood at the door; the man who answered the door had blood on his hands; and the woman in the bathroom had a bloody, broken nose. That is the only information the officer had when he asked 'What happened?' Indeed, although he might have suspected domestic violence, Sevillo did not know at that point whether or not a crime had been committed. The officer interrupted an ongoing emergency and obtained information from the victim in order to assess the situation. Thus, her statement to him was not testimonial." (*Johnson, supra*, 150 Cal.App.4th at p. 1479, original italics.)

Here, Officer O'Barr was responding to a possible domestic disturbance call at a residence. Upon arriving at the scene he encountered a man at the doorway who immediately went back inside upon making eye contact with the officer. O'Barr was then met by an undressed women who was hysterical and crying and who had sustained scrapes on her leg and hip and a cut lip. At that point O'Barr did not know whether a crime had been committed. Further, although O'Barr had allowed Terry to sit on the ground outside of his house, presumably while being watched by other officers, he did not know whether other suspects were involved in the disturbance or whether they were armed. Additionally, based on Jennette's injuries and her emotional state, he had an objective basis for believing there might be an ongoing medical emergency, and he needed additional information about what had happened to determine whether the victim had suffered more serious injuries. Thus, the record supports the trial court's conclusion that Jennette's statements that were admitted into evidence were not testimonial because the primary purpose of O'Barr's interrogating Jennette was to determine if she needed medical assistance.

Terry contends that there was no present ongoing medical emergency when Officer O'Barr spoke with Jennette because she told him that she did not need an

ambulance. He contends the situation was similar to *Hammond v. Indiana* (2005) 829 N.E.2D 444 (*Hammond*), which was discussed in *Davis*, *supra*, 547 U.S. 813 and *Cage*, *supra*, 40 Cal.App.4th 965, two cases in which the court found that the victim's statements to officers were testimonial. Terry is wrong.

Officer O'Barr did not have to accept Jennette's statement that she did not require an ambulance at face value. In view of her obvious injuries and her agitated mental state, O'Barr could have reasonably concluded that she might not be accurately reporting her medical needs and that some questioning was required in order to determine whether she might have suffered an injury that, in fact, did require medical treatment. In any event, Jennette did not tell the officer that she did not need an ambulance until after she had described the earlier incident during which Terry assaulted her. Thus, even if her statements after that point were "testimonial," admission of these statements into evidence was harmless beyond a reasonable doubt.

Further, *Hammond* and *Cage* are easily distinguishable. In *Hammond*, the officer responded to a domestic violence call and did not encounter an ongoing emergency. The officer did not hear any arguments and or encounter any ongoing commotion. Instead, when he arrived, a woman told the interrogating officer that everything was fine, and she apparently did not have any injuries. (*Davis*, *supra*, 547 U.S. at p. 829.) In finding that the victim's oral statements in *Hammond* were testimonial, the court noted that these statements were "neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation[.]" (*Davis*, *supra*, at p. 832.)

In *Cage*, a male juvenile whose mother slashed his face with a piece of glass, was interviewed by a police officer in a hospital emergency room more than an hour after the assault. (*Cage*, *supra*, 40 Cal.4th at pp. 984–985.) Thus, *Cage* is also easily distinguishable from the instant case because with the victim in a hospital room more than an hour after the assault, there was no objective basis for concluding that the victim's statements were elicited to deal with a contemporaneous medical emergency.

8.

Accordingly, we conclude the court did not abuse its discretion when it allowed the prosecutor to introduce into evidence Jennette's statements to Officer O'Barr.

### The Miranda Issue

Terry contends he should have been given his *Miranda* warnings because the evidence was uncontested that he was in custody when he was interrogated by Officer O'Barr. Alternatively, he contends he was denied the effective assistance of counsel if he forfeited this issue by defense counsel's failure to object. We reject both contentions.

> " '*Miranda* requires that a criminal suspect be admonished of specified Fifth Amendment rights. But in order to invoke its protections, a suspect must be subjected to *custodial interrogation* ....' [Citation.] 'Thus two requirements must be met before *Miranda* is applicable; the suspect must be in "custody," and the questioning must meet the legal definition of "interrogation." ' [Citation.] The prosecution has the burden of proving that a custodial interrogation did not take place. [Citation.]
>
> "A person is in custody for purposes of *Miranda* if he is 'deprived of his freedom in any significant way or is led to believe, as a reasonable person, that he is so deprived.' [Citation.] 'Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.' [Citations.]" (*People v. Whitfield* (1996) 46 Cal.App.4th 947, 953, original italics.)

Terry did not object on *Miranda* grounds to the introduction of his statements to Officer O'Barr. Thus, he forfeited this issue on appeal. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

Moreover, "[t]o prevail on a claim of ineffective assistance of counsel, the defendant must show counsel's performance fell below a standard of reasonable competence, and that prejudice resulted. [Citations.] When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that, ' " 'but

9.

for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

The record here does not indicate whether Terry was read his *Miranda* rights prior to talking with Officer O'Barr. This, however, does not necessarily mean that he did not receive these admonitions. Since Terry did not object to his statements being introduced into evidence on *Miranda* grounds, this may simply mean that the prosecutor elected to not introduce evidence that Terry was read these rights because he did not have to. Further, Terry's statements to O'Barr allowed defense counsel to present Terry's theory of self-defense to the court without subjecting him to being cross-examined. Thus, defense counsel may have had a tactical reason for not objecting to the introduction of these statements. In either case, Terry has not met his burden of showing that his defense counsel provided ineffective representation.

Further, as noted above, Terry has not shown that he was subject to a custodial interrogation that triggered his right to be read his *Miranda* rights or that these rights were not read to him. Thus, Terry has also failed to show that he was prejudiced by defense counsel's failure to object on *Miranda* grounds to his statements being introduced into evidence. Accordingly, we reject Terry's ineffective assistance of counsel claim.

**The Sufficiency of the Evidence Claim**

Terry contends that the only evidence that supports his conviction for being under the influence was Officer O'Barr's opinion testimony, which he contends was unsubstantiated and unsupported by the record. Thus, according to Terry, the evidence is insufficient to support his conviction for being under the influence of methamphetamine.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable,

10.

credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] ...We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor revaluates a witness's credibility. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Terry was charged with using and being under the influence of methamphetamine in violation of Health and Safety Code section 11550.

In addressing the "being under the influence" prong of Health and Safety Code section 11550, the Supreme Court stated:

> "One may be guilty of *being* under the influence of drugs in violation of Health and Safety Code section 11550 by being in that state *in any detectable manner*: ' "The symptoms of being under the influence within the meaning of that statute are not confined to those commensurate with misbehavior, nor to those which demonstrate impairment of physical or mental ability." ' [Citations.]" (*People v. Canty* (2004) 32 Cal.4th 1266, 1278, first italics in original, second italics added.)

Terry provided a urine sample that tested positive for the presence of methamphetamine. Additionally, Terry exhibited the following symptoms that, according to Officer O'Barr, indicated he was under the influence of methamphetamine: Terry's pulse rate was 106 beats per minute, his pupils were dilated to five centimeters, his eyelids were fluttering, and his pupils pulsated when exposed to the outer beam of O'Barr's flashlight. Thus, the record contains evidence indicating that Terry was under the influence of methamphetamine in a detectable amount.

Terry contends Officer O'Barr's testimony was insufficient to prove he was under the influence of methamphetamine because he passed one test, and the toxicologist

contradicted O'Barr's testimony that Terry's pupillary dilation indicated that he was under the influence. Terry is wrong.

Terry does not explain how his ability to pass one test undermines the significance of his positive test for the presence of methamphetamine in his system or the other physical symptoms of being under the influence of methamphetamine that he exhibited. Further, as a reviewing court, " '[w]e resolve neither credibility issues *nor evidentiary conflicts;...*' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357, italics added.) Accordingly, we conclude that the evidence is sufficient to sustain Terry's conviction for violating Health and Safety Code section 11550.

## DISPOSITION

The judgment is affirmed.